UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:25-mj-05021-DMF-1 |
| | ) | |
| vs. | ) | Flagstaff, Arizona |
| | ) | January 14, 2025 |
| Liam Gavan Wallace, | ) | 2:33 p.m. |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____)

BEFORE:  THE HONORABLE CAMILLE D. BIBLES, MAGISTRATE JUDGE


TRANSCRIPT OF PROCEEDINGS

DETENTION HEARING

APPEARANCES:

For the Government:
            U.S. Attorney's Office
            By:  DONDI OSBORNE, ESQ.
            124 N. San Francisco St. 410
            Flagstaff, AZ  86001-5296

For the Defendant Liam Gavan Wallace:
            Federal Public Defenders Office
            By: SARAH K. ERLINDER, ESQ.
            124 N. San Francisco St., Ste. 204
            Flagstaff, AZ  86001-0001

Transcriptionist:
Elva Cruz-Lauer
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  Court calls case number 25-5021-MJ, United |
| 3 | States of America versus Liam Gavan Wallace. |
| 4 | This is the time set for detention hearing and status |
| 5 | regarding preliminary hearing. |
| 6 | Defendant is present and in custody. |
| 7 | Counsel. |
| 8 | MS. OSBORNE:  Good afternoon, Your Honor. |
| 9 | Dondi Osborne for the United States appearing on |
| 10 | behalf of Gayle Helart. |
| 11 | Also at counsel table with me is Matt Szmytke from |
| 12 | Pretrial Services. |
| 13 | THE COURT:  Good morning, Ms. Osborne. |
| 14 | Good morning, Officer Szmytke. |
| 15 | PRETRIAL SERVICES OFFICER:  Good afternoon. |
| 16 | MS. ERLINDER:  Hi and good afternoon.  Sarah Erlinder |
| 17 | with Liam Wallace. |
| 18 | THE COURT:  Good afternoon, Ms. Erlinder. |
| 19 | And good morning, Mr. Wallace. |
| 20 | Sir, this is the time scheduled for two hearings in |
| 21 | your case.  We are going to take up the status hearing relating |
| 22 | to the preliminary hearing first. |
| 23 | Ms. Erlinder. |
| 24 | MS. ERLINDER:  If we could actually defer that until |
| 25 | after the detention hearing. |

1      THE COURT:  Sure.  Absolutely.  So actually we are

2   going to turn now to the detention hearing.  And basically

3   Mr. Wallace, as we discussed somewhat quickly at your initial

4   appearance, the only two issues that I'm looking at are whether

5   I believe you pose a risk of nonappearance at future hearings

6   in this case.

7      Whether I believe you would be able to follow my

8   orders and appear down the road; and/or two, whether you pose a

9   danger to the community or to any particular individuals in the

10  community.  My action or my decision is guided by a very

11  specific statute that was passed by Congress.

12     And that takes me to the next issue, and that is,

13  based on the charge that you are facing, it is in a category of

14  charges that Congress have put in a category that mean that

15  there is a legal presumption, and that presumption is that I am

16  to start off assuming you to be a flight risk and/or a danger

17  to the community.

18     Now, because -- Ms. Erlinder.

19     MS. ERLINDER:  Thank you.  I just wanted to make a

20  record here.

21     THE COURT:  Sure.

22     MS. ERLINDER:  When I review the Bail Reform Act and I

23  go to 18 U.S.C. 3142(e)(3)(E), so basically that subsection E,

24  it says that subject to rebuttal by the person, it shall be

25  presumed that no condition or combination of conditions will

1    reasonably assure the appearance of the person as required and

2    the safety of the community, if the judicial officer finds

3    there is probable cause to believe the person committed -- and

4    under that section are the statutes, and there is a variety of

5    ways that that can be triggered, but under E is the statute

6    that Mr. Wallace is charged under, and so we would just, I

7    guess, object.

8          I would say that a probable cause determination has

9    not been made by a judicial official, so we would argue that

10   the presumption has not been triggered.

11         THE COURT:  All right.

12         Ms. Osborne.

13         MS. OSBORNE:  Your Honor, this case did come in by way

14   of complaint, and the complaint sets forth facts relating to

15   the offense, 18 U.S.C. 2423.  It was signed off on by a

16   judicial officer, Judge Fine.

17         And so our position would be that probable cause does

18   exist here, and the Court can find that there's probable cause

19   that the offense occurred based on the complaint in the record.

20         THE COURT:  Thank you.

21         MS. ERLINDER:  Thank you.  The statute says that the

22   individual committed the offense, and I guess my follow-up

23   question would be what the purpose of a preliminary hearing is.

24         I believe that a judicial officer signing a complaint,

25   although it's probable cause for arrest, but at least my

1    understanding is that -- and certainly if we were to just say

2    that the complaint on its own satisfied probable cause there

3    wouldn't be the provision to have a preliminary hearing.

4         THE COURT:  All right.  Thank you.  I appreciate that.

5         I do find that Judge Fine has reviewed the complaint.

6    I have also reviewed the affidavit, and that her finding does

7    qualify as a judicial officer as required by the detention

8    statute.

9         I do note the objection.  Overrule it for the purposes

10    of this hearing.  That's certainly an issue I will take a

11    closer look at down the road.

12         But at this juncture, I am going to maintain really

13    what I was describing to you, Mr. Wallace, is that I am to

14    start off assuming you to be -- pose a risk of nonappearance

15    and to pose a danger to the community, or to any particular

16    individuals in the community.

17         Because of that, it means that your attorney will

18    begin with any argument or proffer of facts.  Then the United

19    States is allowed to proceed with their argument and proffer of

20    facts, and then because there is that legal presumption or

21    burden, then your attorney is allowed a brief rebuttal.

22         I will point out that as I understand it as well, the

23    United States continues to have the burden of persuasion, which

24    is a slightly different distinction; however, because of the

25    way the presumption with respect to these two issues is set

1      out, your attorney is allowed both the first argument and then

2      an opportunity to present rebuttal information or argument, if

3      she believes that's necessary.

4              So with that, I'll turn to you, Ms. Erlinder.

5              MS. ERLINDER:  Thank you.  So if the Court is

6      considering this a presumption case, again, obviously we have

7      our objection, I would argue that it is even more critical that

8      the Court take a closer look at factors into 3142(g).

9              And so just running through them, the nature and

10     circumstances of the offense charged.  This is certainly a

11     serious case.  I would also argue that this factor is actually

12     accounted for in the presumption.  That's how we get here, are

13     the nature and the circumstance of the offense charged.

14             The weight of the evidence is not easy to assess or

15     really -- I guess I would argue that I don't think there's

16     really anyone really in a position to assess that at this

17     point.

18             It certainly -- I understand it's an ongoing

19     investigation, and I do believe that to some degree that's also

20     accounted for in the presumption.  But I think the -- clearly

21     that charges alone don't mandate detention, and we know that

22     for a few reasons.

23             We know that because Congress didn't say it did, and

24     we know that because specifically 3142(c) requires electronic

25     monitoring if someone is released with these charges.

UNITED STATES DISTRICT COURT

1          And so obviously Congress intended that people would

2     be released, and the presumption is not -- it's a consideration

3     but it's not the end of the story.

4          And so from there in the Bail Reform Act we turn to

5     the history and characteristics of the individual, and so in

6     this case we have Mr. Wallace.  Mr. Wallace is 27.  He has

7     lived in Arizona his entire life.  He is healthy.  He doesn't

8     have any mental health issues.

9          One correction we would offer is that he does have

10    autism, and so I think that that probably falls -- it doesn't

11    fall neatly in either mental health or physical health, but I

12    think it's worth noting for the Court.

13         Mr. Wallace's family is all in Arizona.  His father

14    and his grandmother are present in court.  They came here from

15    Florence today.  His mother and his stepfather also live in the

16    valley.

17         Mr. Wallace has worked as a truck driver since he was

18    able to get his CDL when he turned 21, so he has had consistent

19    work in the same line of work.

20         He has no criminal history.  We did learn about a

21    shoplifting charge, juvenile shoplifting charge that was

22    dismissed, but that's it.  He has never failed to appear.  He

23    doesn't have any warrants.  He doesn't have any substance abuse

24    issues.

25         I anticipate that the government is going to

1    discuss -- and there's some reference to it in the Pretrial

2    Services report, an ongoing investigation in -- or an

3    investigation through the Phoenix Police Department.

4          The government did share the reports.  I appreciate

5    that, and I guess to just kind of -- essentially to get ahead

6    of it, it was interesting because the reports are titled "Child

7    Molestation."  And when you actually read it -- so one,

8    Mr. Wallace wasn't present.  He was actually in Kingman while

9    they were in Phoenix.

10         And the individuals involved -- so essentially these

11   people -- Mr. Wallace had picked up hitchhikers in Missouri.

12   They told him that they were 20 and 21 and that they were

13   fleeing abuse and had family in Arizona.

14         They got here.  They stayed with him for a couple of

15   day.  He continued working, so he wasn't there.  He gave them

16   food.  He gave them clothes.  And -- but critically during --

17   what's in this report is they were asked if anything sexual

18   happened.  They said no.  They were asked if they were given

19   alcohol.  They said, "No, he gave us snacks.  He was nice to

20   us.  He didn't hit us," which makes -- and I think the quote

21   is, "He didn't hit us, which makes this better than there," or

22   something to that effect.

23         And so there's not even any allegation there's

24   anything sexual going on.  It's certainly unusual, but I

25   think -- I would offer that in that situation -- that this is

1    not an equivalent situation, or this isn't some kind of, you

2    know, prior bad act or something.

3            This was -- yeah, there's no allegation there's

4    anything kind of untoward going on with these individuals who,

5    I guess for their sake I hope they didn't go home.  I hope they

6    went to a safer home.

7            But Mr. -- continuing with the Bail Reform Act

8    factors.  Mr. Wallace is not on probation or parole or any

9    release, because he has no criminal history.

10           And in terms of dangerousness, I think that any

11   dangerousness we would argue really arises from the

12   presumption.  Mr. Wallace otherwise does not have a history of

13   dangerousness, and that Mr. Wallace -- and that looking at it,

14   I think the Court can see dangerousness pretty narrowly for

15   Mr. Wallace, and therefore can tailor conditions pretty

16   narrowly to mitigate that.

17           So Mr. Wallace can be ordered on electronic

18   monitoring, as the law requires.  He can be ordered not to have

19   access to the Internet.  He can -- there's a number of

20   conditions the Court can impose.

21           I don't think the Court is reasonably concerned about

22   Mr. Wallace going out and punching someone or something to that

23   effect.  And the ways that the Court might consider him

24   dangerous are pretty easily mitigated with release conditions.

25           Mr. Wallace has very strong family support.  He has

1    very deep roots in Arizona, and he really does not have the

2    will or the means to flee.

3        And I share this because I liked it, not to embarrass

4    him, but Mr. Wallace did share yesterday as we were talking,

5    his perspective that there are three certainties in life, and

6    it's death, taxes, and that you can't escape the courts.  And I

7    offer that because that is truly the attitude he's come in

8    with.

9        And at this point, he is looking -- his ideal

10   placement would be home with his -- or at least back with his

11   grandmother and his father, and he wants to be there to help

12   them, kind of physically and financially.

13       But we'd certainly explore other placements if that

14   ended up not being an option.  So at this point we would ask

15   the Court to follow Pretrial's recommendation and have Pretrial

16   assess the Wallace's home for suitability for Mr. Wallace to

17   return there.

18       Thank you

19       THE COURT:  Thank you.

20       Ms. Osborne.

21       MS. OSBORNE:  Thank you, Your Honor.  I just wanted to

22   let the Court know that Mr. Szmytke wanted to, for the record,

23   clarify there was a mistake in the addendum to the Pretrial

24   Services report just briefly.

25       THE COURT:  I somewhat suspected that 2024 was not the

1    correct date, Officer Szmytke.

2         U.S. PROBATION OFFICER:  Correct, Your Honor.  2014

3    was the correct date.

4         THE COURT:  All right.  Thank you.  I will amend the

5    addendum to the Pretrial Report to reflect "2014."  Thank you.

6         MS. OSBORNE:  Thank you, Your Honor.

7         As referenced by Ms. Erlinder, the Pretrial Services

8    report does recommend that the defendant be screened for

9    location monitoring or rather the residence be looked at for

10   potential placement.

11        Our request, Your Honor, is that the defendant be

12   detained, and we would submit to the Court that the defendant

13   does present a danger, not just based on the facts of the

14   instant case, but also the facts relating to the investigation

15   in Phoenix, which I will relate to the Court in some detail.

16        The offense in this case, the Court is somewhat aware

17   of just based on the complaint, but I wanted to relate the

18   facts with a little more specificity.

19        On December 28th of '24, the mother of the 12-year-old

20   child referenced as "Jane Doe" in the complaint, reported that

21   her child was missing.  She was aware that Jane Doe had been in

22   contact with Mr. Wallace previously and therefore suspected

23   that she might be with Mr. Wallace.

24        She had apparently run away from home on some previous

25   occasions, and in one of those instances where she had run

1    away, Mr. Wallace returned the child to her at the home, and

2    apparently told her that he was the father of an individual

3    that Jane Doe was dating.

4         He purported to have a son, and in that instance,

5    brought Jane Doe back.  We later found out that -- it later

6    comes to light that that was not truthful.

7         Investigators -- after the report by the mother of

8    Jane Doe, investigators had Mr. Wallace's phone number from

9    Jane Doe's mother, and that phone number was used to obtain

10   location information via search warrant.

11        Investigators also contacted Mr. Wallace's employer,

12   and they initiated a three-way call.  The employer,

13   investigators, and the defendant, and apparently during that

14   phone call, they were able to reach Mr. Wallace.

15        He advised he was traveling to Salt Lake City, Utah.

16   He said he was alone in his truck, and he refused at that time

17   apparently to pull over to meet with law enforcement.

18        Kane County, Utah authorities located the semi-truck

19   that Mr. Wallace was driving and pulled it over and did contact

20   Mr. Wallace.  Upon contact, he at that point said that he was

21   "with his lady," or "girlfriend," who he said was 19 years of

22   age; however, the only other person in the vehicle with him was

23   12-year-old Jane Doe.

24        He was at that time arrested on state kidnapping

25   charges.  After arrest and after Miranda, Mr. Wallace was

interviewed.  He told investigators that he knew Jane Doe was
12 years old.

He said he met her online in late October or early
November '24.  He admitted to meeting her in person on anywhere
between five and seven occasions.  He said he had taken her to
California and Nevada prior to their trip to Utah and admitted
to previously lying about being father of Jane Doe's fictitious
boyfriend.

He denied ever having sexual contact with Jane Doe,
however.  Jane Doe was interviewed.  She indicated that she met
Mr. Wallace on a "teen chat" website.  That's a website for
persons 13 to 19 years old.  For the record, the defendant is
27 years of age.

She indicated that Mr. Wallace initiated the contact,
and then after that initial contact online, contacted her via
telephone.

She said she was sneaking out almost every night to go
see Mr. Wallace.  They had sexual intercourse several times,
including in Arizona and Nevada, in his vehicles as well, and
that he had taken her to California.

A search warrant of Mr. Wallace's residence revealed
six electronic devices, also female underwear, journals of
females, one of which included a list of phone numbers, and a
phone number, including Jane Doe's mother's phone number.

With respect to the incident that -- or investigation

1    that's referenced in the Pretrial Services report on the last

2    page, that is the Phoenix Police Department investigation

3    regarding an offense or an investigation regarding minor male

4    and female that were from Missouri.

5            What reports reveal regarding that incident is back in

6    November, specifically November 26th of '24, Phoenix police

7    investigators responded to a call from R.B.  She was the mother

8    of two juvenile children.

9            Her daughter was 16 years of age.  Her son, 17 years

10    of age.  She said that her children were missing from their

11    residence in St. Joseph, Missouri.  They went missing on

12    November 21st.

13            Friends of the juveniles -- and the juvenile child

14    female is S.W.  The juvenile male is H.W.

15            Friends of both of those juveniles advised police that

16    the two juveniles had been communicating with the friends and

17    they had -- the juveniles had left to meet a guy named Liam

18    Wallace.  The friends were attempting to talk the juveniles

19    into coming back home.

20            The juvenile female apparently had told one of the

21    friends online the address where she was staying, and that

22    address turned out to be the address of Mr. Wallace in Phoenix.

23            On November 26th of '24, Phoenix police responded to

24    conduct a welfare check there, and when they got there, they

25    contacted the roommate of Mr. Wallace, initials S.A.

1   S.A. advised there were two other people in the

2   residence.  She said that Mr. Wallace had brought these two

3   persons home.  She said they looked underage, so she asked

4   Mr. Wallace about that, and he told her that they were not

5   underage, that he had known them for some time and was helping

6   them out.

7   The roommate said that the juvenile female had been

8   sleeping in the same bedroom as Mr. Wallace.  She believed they

9   were sexually active, while the male juvenile had been sleeping

10  on the couch.

11  The roommate also said that Mr. Wallace brings random

12  people over regularly, and she does not trust the kind of

13  people he invites over, so she has a separate lock on her

14  bedroom door.  The juveniles, when police arrived, were found

15  hiding in the closet.

16  The juveniles were interviewed and apparently told

17  police that Mr. Wallace had approached them at a bus stop in

18  St. Joseph, Missouri and offered them a ride.

19  They indicated they wanted to get away from their

20  parents who were abusive and said that Mr. Wallace promised the

21  male juvenile a job with his trucking company.  The female

22  juvenile did deny engaging in sexual relations with

23  Mr. Wallace.

24  The Pretrial Services report does indicate that --

25  well, expresses some concerns about the suitability of a

1    third-party custodian named in that Pretrial Services report.

2         The other concerning thing in the Pretrial Services

3    report, from the government's perspective, is the victim's

4    residence is one and a half hours from the proposed residence

5    of the defendant.  The defendant apparently now has no current

6    employment.

7         Our position, Your Honor, is that the defendant's

8    contacts with the 12-year-old child in this case, by visiting

9    teen chat rooms, approaching juveniles at a bus stop in

10   Missouri, shows the defendant presents an extreme danger to the

11   community.

12        He engages in fiction, essentially.  He lied to the

13   roommate in indicating that the juveniles were actually adults.

14   He lied to the mother of Jane Doe saying he was the father of

15   the boy Jane Doe was dating.

16        He lied to the police about having Jane Doe in his

17   truck.  And when pulled over, lied again saying it was just his

18   19-year-old girlfriend in the vehicle.

19        Our position, Your Honor, is the case is strong

20   evidentially.  We maintain a presumption of detention here, and

21   due to the danger presented to the children, children most

22   vulnerable to persons like Mr. Wallace who apparently plan and

23   groom, there is a greater danger to the community at large as

24   well.

25        So we're asking that the defendant not be screened for

1   place in a home but that he be detained.

2          THE COURT:  Thank you, Ms. Osborne.

3          Ms. Erlinder.

4          MS. ERLINDER:  Thank you.  I just want to reiterate

5   that we're just asking essentially to explore the option of

6   whether Mr. Wallace has a placement that he can go to, and at

7   least, certainly, I think to assess whether there is a

8   possibility -- I would just imagine that the Court would need

9   to know whether it was a possibility to make that

10  determination.

11         I guess I would also offer that -- the way that this

12  report is written, there's a summary section at the beginning

13  that refers to the roommate believing that there was a sexual

14  relationship.  That's not mentioned again in the entire report,

15  and I could submit it and the Court could have it.

16         So in -- when it's -- the interview with her is

17  described, that's not in here.  So, you know, I think

18  especially with these kind of allegations, it's very important

19  to be very precise, because it really matters, and it certainly

20  matters to Mr. Wallace.  It certainly matters to the alleged

21  victims.  It is important to be accurate.

22         And so -- and I don't say that to -- in relation to

23  the government.  It's too bad that the report is kind of as

24  vague as it is, but I just wanted to note that when they're

25  describing the interviews, that is not in that section.

1            And yes -- and so I think that it's -- I would just

2    reiterate that I think it's really, as I mentioned at the

3    beginning, it's critical, especially in -- I believe especially

4    in a presumption case, for the Court to be very careful with

5    the factors, and also with the information that is taken in

6    because things can -- they are sensitive topics, and so we just

7    want to be sure that we're doing -- that we're accurate and

8    that we're doing it right.

9            So for all of these reasons -- and we do believe that

10   we have overcome the presumption.  That there are release

11   conditions potentially that would mitigate concerns about

12   danger or flight, and just asking the Court to have

13   Mr. Wallace's family's home assessed so that we can determine

14   whether that may be the placement that satisfies any Court

15   concerns.

16           Thank you.

17           THE COURT:  Thank you, Ms. Erlinder.

18           In evaluating flight risk, really or nonappearance and

19   dangerousness, your attorney has quite nicely gone through the

20   factors that I am to look at.

21           I start off with the nature and circumstances of the

22   offenses charged.  In this case, it is a very serious offense.

23           At your initial appearance, I advised you that if

24   convicted of this offense, you would be facing a minimum of ten

25   years in prison and a maximum of life in prison.  So it is

1    extremely serious.

2           When I look more -- and it does carry, in this Court's

3    view anyway, the legal presumption.

4           Now, looking more broadly at the circumstances of the

5    offense, and looking at the affidavit that is filed in support

6    of the complaint or the charge, and looking at the proffers

7    that have been provided to the Court, it does appear that this

8    particular individual, the alleged victim in this case, Jane

9    Doe, who is 12 years old, apparently what brought contact with

10   her, really into the realm of possibility, was being involved

11   in an Internet chat room that's designed for teenagers.

12          And it appears that all of the instant case started

13   with a teen chat Internet room, which does raise real concerns

14   about the use of the Internet, particularly in light of the

15   devices -- the number of devices that were proffered both in

16   the affidavit and in a proffer presented by the United States.

17          That is of tremendous concern.  That is how a

18   12-year-old came into your orbit.  It is of considerable

19   concern that there were trips to California alone with a 12

20   year-old-girl, and Nevada.

21          It is also a real concern to the Court as well that in

22   meeting the alleged victim's mother, you presented yourself as

23   a father of a 13-year-old boy who doesn't exist and also a

24   relationship that doesn't exist.

25          And that is, frankly, quite brazen as a way to meet

1    the parent of a child that -- a 12-year-old child that you've

2    been engaging in this kind of activity and -- even in terms of

3    the trips.

4         It is also of concern to the Court that when contacted

5    by law enforcement, that apparently, not only was there a

6    refusal to stop, which would have been in the best interest of

7    the child, but also giving a false statement to law

8    enforcement.

9         And then when stopped in Utah by law enforcement, the

10    description of the child as being an adult, which obviously is

11    false.  It appears that you knew quite well that that was

12    false.  That's of tremendous concern to the Court as well.

13         With respect to the proffered information relating to

14    the juveniles out of Missouri, it is of concern to the Court

15    that that -- basically that situation came about with a trip to

16    a bus station, and that two juveniles were picked up there and

17    transported to Arizona and were apparently staying in your

18    home.

19         I will not venture or make any inferences, other than

20    apparently the roommate being told that they were adults and

21    not juveniles, which obviously creates real concerns as well.

22         Based on the evidence presented in the affidavit, it's

23    very difficult -- it appears at this very early stage that the

24    weight of the evidence may be quite strong.  It's a 12-year-old

25    child.

1          And based on what's been described or what she has

2     described, including her apparent frustration that she had

3     discerned that you might be cheating on her, which is a really

4     alarming perspective for a 12-year-old child to have, but that

5     really when I look at all of the evidence, it does appear to be

6     quite strong.  But we are very early in the case, and so I

7     wouldn't give that much weight at this time.

8          I also will completely follow the Ninth Circuit, which

9     tells us not to give consideration, or a lot of consideration,

10    to the weight of the evidence.  Given all of the factors in the

11    Ninth Circuit directive, I will not consider the weight of the

12    evidence.

13         I next look at your history and characteristics, and

14    that includes character, physical and mental condition, family

15    ties, employment, length of residence in the community, past

16    conduct, history of drug or alcohol abuse, those sorts of

17    things.

18         And I do note as well that your father and your

19    stepmother have appeared.  They have traveled here today to be

20    here to really support you.

21         It does appear that you are basically grounded in the

22    Phoenix area.  That's your home base.  But I also factor in as

23    well the nature of your work, which has had you traveling, and

24    it has put you in both a position to take a 12-year-old out of

25    state, and also pick up juveniles, for whatever reason, in

1    another state and bring them to Arizona.

2          I do note that, again, overall your ties are to

3    Arizona.  You have no criminal history at all, and apparently,

4    no substance abuse challenges.  There's no record of any of

5    that.  It doesn't appear that any of this would be driven by

6    substances, and certainly the nature of your employment would

7    make -- would also articulate that you don't have substances.

8          However, I do find, based on the really vulnerable

9    nature of, in this case, a 12-year-old child, and the fact, it

10   appears, that you have taken her out of state multiple times,

11   and that you have had contact with her and lied to her mother

12   about who you were and what your relationship with her would

13   be.  I do find -- and the way that you came into contact with

14   her, which was through an Internet site that is dedicated to

15   teens.

16         I do find that you do pose a danger to, particularly

17   children, and that would be based on the nature of the instant

18   charge, separate and apart from the presumption in this case,

19   based on the facts that have been presented here.

20         I do find that you pose independently, a danger to

21   children, and I do that separate and apart from the presumption

22   that does, I believe, attach to this case.

23         When I consider all of these factors with the legal

24   presumption in this case, I do find that you have not overcome

25   the presumption in this case; however, I will find

1    independently on the record that's before me, that you do

2    pose -- by a clear and convincing standard, you do pose a

3    danger to children.  So even independent of the presumption, I

4    would find that you would be -- need to be detained in custody.

5         In terms of considering options, I have real concerns

6    based on what I have reviewed here and the very specific danger

7    to young teenagers, to vulnerable young people.

8         I am concerned -- extremely concerned about the

9    Internet access, and I am not convinced that there would be a

10   way, if you were determined to have -- basically to reach the

11   Internet, I am not satisfied really that there are any

12   conditions that I'd be able to attach that would mitigate the

13   danger that has been demonstrated here.  So I am going to

14   detain you in custody pending further proceedings.

15        Now, the next proceeding in this case would be setting

16   a preliminary hearing in this court.  I assume, Ms. Erlinder,

17   that you would want us to set a preliminary hearing?

18        MS. ERLINDER:  Can I have one second?

19        THE COURT:  Go ahead.

20        (Discussion between Ms. Erlinder and the Defendant.)

21        MS. ERLINDER:  Thank you.  In discussing with

22   Mr. Wallace -- and we did have discussions with Ms. Helart

23   also.  There's not very much discovery at this point, but she

24   is willing to provide it early in exchange for Mr. Wallace's

25   waiver of the preliminary hearing, and that's what he'd like to

1    do.

2        THE COURT:  All right.  Thank you.

3        So Mr. Wallace, while you have a right to have a

4    preliminary hearing, you also have a right to waive that

5    hearing, particularly when it's in exchange for a benefit from

6    the United States.  Is that what you would like to do, is to

7    waive the preliminary hearing?

8        THE DEFENDANT:  Yes, Your Honor.

9        THE COURT:  All right.  So I have obviously reviewed

10   the affidavit, but basically what that means is that there will

11   not be a preliminary hearing.  I find that you have waived your

12   preliminary hearing.

13       So your next hearings would in all likelihood be in

14   the Phoenix courthouse.  I am inclined to go ahead and order,

15   particularly since he and his family are based out of Phoenix,

16   I would be inclined to go ahead and order Mr. Wallace

17   transported to a facility that's closer to the Phoenix

18   courthouse, unless there was a specific reason not to do so.

19       Ms. Erlinder.

20       MS. ERLINDER:  I don't believe so.  And, yes, his

21   father and grandmother live in Florence, and so it's certainly

22   closer for them.

23       THE COURT:  Very good.

24       So Mr. Wallace, I will go ahead and order that you be

25   transported to a facility that was closer to the Phoenix

1    courthouse.  That will in all likelihood be in the Florence

2    area.  And that will be pending your next hearings in this

3    case.

4            Ms. Osborne, is there anything further we should

5    address on behalf of the United States?

6            MS. OSBORNE:  No, Your Honor.  Thank you.

7            THE COURT:  Thank you.

8            Ms. Erlinder, is there anything further we should

9    address on behalf of Mr. Wallace?

10           MS. ERLINDER:  I don't think so.  Thank you.

11           THE COURT:  Thank you.

12           We are adjourned.

13       (Proceedings concluded at 3:08 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1      C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, court-approved transcriber,

4     certify that the foregoing is a correct transcript from the

5     official electronic sound recording of the proceedings in the

6     above-entitled matter.

7

8          DATED at Phoenix, Arizona, this 31st day of January,

9     2025.

10

11                                    s/Elva Cruz-Lauer
                                      Elva Cruz-Lauer
12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT